NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ANN MARTIN,
*Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA,
*Respondent*,

CAMP VERDE UNIFIED SCHOOL DISTRICT,
*Respondent Employer*,

ARIZONA SCHOOL ALLIANCE,
*Respondent Carrier*.

No. 1 CA-IC 16-0059
FILED 6-29-2017

Special Action - Industrial Commission
ICA No. 20143-170460
INSCA No. 2014001288A
The Honorable Gaetano J. Testini, Administrative Law Judge

**AWARD AFFIRMED**

COUNSEL

Ann Martin, Camp Verde
*Petitioner*

Industrial Commission of Arizona, Phoenix
By Jason M. Porter
*Counsel for Respondent ICA*

Jardine, Baker, Hickman & Houston, PLLC, Phoenix
By K. Casey Kurth
*Counsel for Respondent Employer/Carrier*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Patricia K. Norris and Judge Jennifer B. Campbell joined.

---

**J O H N S E N**, Judge:

¶1        This is a special action review of an Industrial Commission of Arizona ("ICA") award concerning a compensable injury. The claimant, Ann Martin, argues the administrative law judge ("ALJ") erred by finding her physical condition is stationary without permanent impairment. For the reasons that follow, we affirm the award.

### FACTS AND PROCEDURAL BACKGROUND

¶2        On October 15, 2014, Martin, a paraprofessional and print-room coordinator at Camp Verde Elementary School, slipped as she stepped off a sidewalk on her way to recess duty.[1] Although Martin did not fall, she "tweaked" her back in her effort to maintain her balance. The following morning, Martin woke with pain in her lower back, left hip and left buttock.

¶3        On October 21, 2014, her symptoms worsening, Martin visited urgent care. There, Martin was diagnosed with "[l]ow back pain" and referred to physical therapy for treatment. The same day, Martin filed a claim for industrial injury, and later she began receiving benefits from the school's insurance carrier.

¶4        Despite physical therapy, the pain persisted. On December 15, 2014, Martin made a trip to the emergency room, where she underwent an x-ray on her lumbosacral spine. The x-ray, however, revealed no

---

[1]        We consider the evidence in the light most favorable to upholding the award. *Lovitch v. Indus. Comm'n*, 202 Ariz. 102, 105, ¶ 16 (App. 2002).

obvious defects. Accordingly, Martin was prescribed medicine for her pain and told to follow up with her primary care provider.

**¶5**         On January 23, 2015, Martin met with Dr. Kyle Norris, who specializes in physical medicine and rehabilitation with a subspecialty in pain medicine. Norris performed a physical exam of Martin and reviewed the results of an MRI from earlier in the month. Although Norris believed the MRI revealed a "mild" disc bulge, he recommended "continued conservative management," including additional physical therapy, given the "relatively unremarkable physical examination." Over the next few months, Martin continued to follow-up with Norris, and on April 6, 2015, after physical therapy and three epidural steroid injections failed to alleviate Martin's pain, Norris referred Martin to Dr. Donald Hales, an orthopedic surgeon.

**¶6**         On June 2, 2015, Martin met with Hales. Hales performed a physical exam of Martin's lumbar spine and reviewed the results of Martin's January 2015 MRI. After concluding the MRI was "normal," Hales opined that Martin might have injured her left sacroiliac joint. According to Hales, several tests he performed on Martin during the physical exam indicated as much, including the "FABER" test.[2] Hales suggested Martin undergo a diagnostic sacroiliac joint injection in her left side; he believed that if that injection provided greater pain relief than her earlier epidural injections, it would tend to show that the left sacroiliac joint was the pain source and would confirm his initial diagnosis of "Sacroiliac joint dysfunction."

**¶7**         On June 9, 2015, before Martin received a sacroiliac joint injection, she met with Dr. John Beghin for an independent medical examination. In addition to reviewing Martin's x-rays and her January 2015 MRI, Beghin performed a physical examination. After noting Martin's x-rays and MRI were "normal," Beghin reported that the results of his own FABER test were negative for a left sacroiliac injury. Accordingly, Beghin diagnosed Martin with a "[p]robable lumbar sprain/strain with aberrant pain response" and concluded Martin's condition was stable without permanent impairment. As a result, Martin's claim was closed without permanent impairment effective June 9, 2015.

---

[2]      According to the evidence, the FABER test is the "standard" method for applying stress to the sacroiliac joint. A positive FABER test is one that reproduces a patient's symptoms upon applying stress to the sacroiliac joint.

**¶8** While Martin protested the termination of her benefits and awaited a hearing, she continued to seek medical treatment for her pain. She received her first sacroiliac joint injection on August 18, 2015, and a second on November 5, 2015. As a result, on January 8, 2016, Beghin performed a second independent medical examination. After Beghin reviewed Martin's relevant medical history and performed a second FABER test, his conclusions remained unchanged.

**¶9** The ALJ's hearing on Martin's protest began on January 29, 2016 and concluded after three days of testimony, ending June 10, 2016. In the meantime, on February 25, 2016, Hales recommended Martin undergo left sacroiliac joint fusion surgery, and in May, Hales performed the surgery.

**¶10** The ALJ issued a Decision Upon Hearing on July 5, 2016, in which he found Martin's condition was stationary without permanent physical impairment as of June 9, 2015. Martin requested review and the ALJ affirmed the decision. This timely special action followed.

**¶11** This court has jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(2) (2017), 23-951 (2017) and Arizona Rule of Procedure for Special Actions 10.[3]

## DISCUSSION

**¶12** In reviewing the ICA's awards and findings, we defer to the ALJ's factual findings and review questions of law *de novo*. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003). The ALJ has discretion to resolve any conflicts in the evidence, *see Perry v. Indus. Comm'n*, 112 Ariz. 397, 398 (1975), and is the sole judge of witness credibility, *Henderson-Jones v. Indus. Comm'n*, 233 Ariz. 188, 191, ¶ 9 (App. 2013). As long as the ALJ's findings are not unreasonable, this court will not disturb them. *Hackworth v. Indus. Comm'n*, 229 Ariz. 339, 343, ¶ 9 (App. 2012).

**¶13** To be compensable, an injury must arise out of and in the course of employment. A.R.S. § 23-1021 (2017). The claimant has the burden to prove the elements of the claim by a preponderance of the evidence. *Brooks v. Indus. Comm'n*, 24 Ariz. App. 395, 399 (1975). Unless the causal relationship between the industrial incident and the resulting injury

---

[3] Absent material revision after the relevant date, we cite a statute's current version.

is apparent, it must be proved by expert medical testimony. *Raymer v. Indus. Comm'n*, 18 Ariz. App. 184, 186 (1972).

**¶14** On appeal, Martin challenges the ALJ's finding that her medical condition was stationary without permanent impairment as of June 9, 2015. To that end, Martin argues first that the ALJ was obligated to accept Hales's opinion that Martin suffered from left sacroiliac joint dysfunction.

**¶15** Although Martin's medical records, which were in evidence, indicate that Hales diagnosed her with left sacroiliac joint dysfunction, Hales was not called to testify at Martin's hearing. Even if he had testified, the ALJ received Beghin's two independent medical examination reports outlining his conclusion that Martin's physical condition was stationary without permanent impairment as of June 9, 2015, and Beghin also testified in support of that conclusion at Martin's hearing. Accordingly, the ALJ was within his discretion in determining which of the competing diagnoses of Martin's condition was more probably correct. *See Perry*, 112 Ariz. at 398 ("[I]t is [the ALJ's] privilege to determine which of the conflicting testimony is more probably correct.").

**¶16** Next, Martin argues that an asserted inconsistency in Beghin's two reports "shed doubt on whether [Beghin's] opinion is truly independent" and therefore credible. At issue is the following sentence, which was in the discussion of Martin's x-rays in Beghin's first report but not his second: "Limited projection of the hips reveals probable normal hip joint space but the study is inadequate for a thorough evaluation of the hips." At the hearing, Beghin testified that his evaluation of Martin's hip joints was irrelevant to her left sacroiliac joint. Because the ALJ is the sole judge of witness credibility, we cannot conclude the ALJ erred in relying on either of Beghin's independent medical examinations or his testimony at Martin's hearing.

**¶17** Additionally, Martin asserts she submitted supplemental evidence showing that Beghin misrepresented statements Martin made during her second independent medical examination. The evidence Martin submitted was an audio recording of her second independent medical examination, which she argues contradicts Beghin's account of the pain relief she obtained immediately after her second sacroiliac joint injection. We have reviewed the transcript of that recording and identify no clear contradictions. Moreover, the ALJ is the sole judge of witness credibility. *Henderson-Jones v. Indus. Comm'n*, 233 Ariz. 188, 191, ¶ 9 (App. 2013).

¶18            Finally, Martin argues that the medical treatment she received after June 9, 2015 demonstrates that the ALJ erred in concluding her condition was stationary without permanent impairment as of that date. Indeed, Martin argues the surgical fusion of her left sacroiliac joint in May 2016 "is leading . . . to the stationary status desired by the worker's compensation system."

¶19            At the hearing, Beghin explained that there are two types of "sacroiliac diagnoses."  The first, known as sacroiliitis, is diagnosed based on the presence of objective findings that typically appear on "plain film." Additionally, an individual suffering from sacroiliitis should experience symptoms with stress of the sacroiliac joint, such as that applied during a FABER test.  Because Martin's x-rays and MRI appeared normal, and because she did not experience symptoms during either FABER test Beghin performed, Beghin concluded she did not suffer from sacroiliitis.  Indeed, when Beghin performed the FABER test during his second independent medical examination, Martin reported that it made her symptoms feel better.

¶20            According to Beghin, the second sacroiliac diagnosis is known as sacroiliac joint dysfunction.  At the outset of Beghin's testimony, he noted that sacroiliac joint dysfunction is controversial because it is not diagnosed based on objective findings, such as imaging studies, MRIs, bone scans and plain films.  Rather, he testified that diagnoses are made based on sacroiliac stress tests, such as the FABER test, none of which had been validated as scientifically reliable diagnostic methods.  And, as mentioned above, Martin tested negative for a sacroiliac injury in each of the FABER tests Beghin performed.

¶21            Moreover, contrary to Martin's assertion on appeal, Beghin testified that neither sacroiliac joint injection she received could be considered diagnostic for sacroiliac joint dysfunction in this case. Specifically, he said, if either injection was to be considered diagnostic, there should have been "immediate" pain relief following the injection.[4] According to Martin's "daily pain diary," however, her symptoms were "worse" in the two days following the first injection.  Although the diary showed that Martin's pain decreased on the day of her second injection from a "five" pre-injection to a "three" post-injection on a scale from one to

---

[4]      The anesthetic in the injection immediately numbs the sacroiliac joint.  It follows that, if the sacroiliac joint was the pain source, then Martin would have experienced immediate relief.

ten, her symptoms remained unchanged in the four days that followed. For these reasons, Beghin testified that neither injection supported a diagnosis of sacroiliac joint dysfunction.

**¶22**      On appeal, Martin cites Hales's records, which indicated that he believed Martin's pain was the result of left sacroiliac joint dysfunction. According to a report dated February 25, 2016, Hales found support for this diagnosis in Martin's response to the sacroiliac joint injections—on the day of his report, Martin said 95% of her symptoms disappeared immediately upon receiving the injections—and several positive physical tests for sacroiliac joint pain, including a FABER test on June 2, 2015. As noted, however, we cannot conclude the ALJ erred in adopting Beghin's contrary opinion or that the ALJ was unreasonable in finding Martin's condition was stationary as of June 9, 2015.

## CONCLUSION

**¶23**      For the foregoing reasons, we affirm the award.



AMY M. WOOD • Clerk of the Court
FILED:  AA